**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

―――――――――――――――――――――――――――――

**JASON LOPEZ,**

                                        **Plaintiff,**

        **vs.**                                                      **5:18-cv-952**
                                                                        **(MAD/ATB)**
**ERIC GERACE,**

                                        **Defendant.**

―――――――――――――――――――――――――――――

**APPEARANCES:**                                     **OF COUNSEL:**

**OFFICE OF MICHAEL A. CASTLE**          **MICHAEL A. CASTLE, ESQ.**
110 West Albany Street
Herkimer, New York 13350
Attorneys for Plaintiff

**OFFICE OF THE CORPORATION COUNSEL**     **DANIELLE PIRES, ESQ.**
City Hall Room 300                                        **TODD M. LONG, ESQ.**
233 East Washington Street
Syracuse, New York 13202
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

        Plaintiff commenced this civil rights action on August 10, 2018, alleging that Defendant

used excessive force during the course of an arrest in violation of the Fourth Amendment to the

United States Constitution.  *See* Dkt. No. 1.  Currently before the Court are Defendant's motions

for summary judgment and to strike Plaintiff's affidavit in opposition.  *See* Dkt. Nos. 71 & 80.

### II. BACKGROUND[1]

**A.      Neighbor Calls 911 Over Possible Violent Domestic Dispute**

―――――――――――――――――

[1] Unless otherwise noted, the facts set forth below are undisputed.

In the early morning hours of Wednesday, April 13, 2017, at approximately 5:21 a.m., the Onondaga County 911 Center ("911") received a call from Mrs. Martha Kwasniewski regarding a disturbance at 349 Hillview Avenue, Syracuse, New York 13207. *See* Dkt. No. 71-43 at ¶ 1. Mrs. Kwasniewski was prompted by what she heard from 349 Hillview to call from her neighboring house just feet away at 353 Hillview Avenue where she had lived for more than 20 years. *See id.* at ¶ 2.

Approximately two hours earlier, Plaintiff had returned to the residence at 349 Hillview with his three friends – Ashley, Stephanie, and Chaca – after Plaintiff had been out drinking. *See id.* at ¶ 3. Plaintiff smoked marijuana in a park near 349 Hillview and drank Coors Light before his friends left 349 Hillview sometime around 4:03 a.m. *See id.* at ¶ 4. Mrs. Kwasniewski heard loud noises coming from inside the residence at 349 Hillview and it sounded to her as if someone was being beaten up and that is what prompted her to call 911 to get police involved. *See id.* at ¶ 5.

Defendant would later in the early morning hours enter "the residence [at 349 Hillview] and observe[ ] the entire living room and kitchen area to be in disarray." *Id.* at ¶ 6. Plaintiff's Spanish-speaking mother Ruth Guzman would later tell Defendant through the interpretation of her teenage grandson, Luis Lopez Davila, that Plaintiff came to the "residence approximately two hours prior and began screaming and damaging property for no apparent reason." *Id.* at ¶ 7.

Mrs. Kwasniewski's concerns were, in part, based upon Plaintiff's previous interactions with her and her husband, as well as her observation of multiple police interventions at 349 Hillview prior to this incident. *See id.* at ¶ 8. Mrs. Kwasniewski's observations before police arrived were reflected in the 911 call-taker's notes, which in turn were transmitted and made available on the date of the incident to Defendant and other Syracuse Police Department ("SPD")

patrol officers through their Mobile Data Terminals ("MDT").  *See* Dkt. No. 71-43 at ¶ 9.  The

information that was transmitted to the SPD patrol officers included the following:

a.  "KASNIEWSKI [sic], MARTHA VOIP 04/13 05:21:31
M911 NO CC – 2 MALE FIGHTING" at 05:22:32 a.m.;

b.  "UNKN WEAPONS" at 05:22:40 a.m.;

c.  "SUSP 1 JASON LOPEZ – 20S H/M – LIGHTSKINNED –
UNK LSW CALLER WONT [sic] LOOK OUTSIDE" at
05:24:00 a.m.;

d.  "CALLER CANN NOT [sic] SEE THEM AT THIS TIME
–" at 05:24:11 a.m.;

e.  "STATES CAN HEAR THEM INSIDE ABOVE
ADDRESS [349 Hillview] TEARING THINGS UP" at
05:25:18 a.m.;

f.  "SUSP – UNK MALE OR FEMALE CALLER COULD
NOT TELL – STATES THERE IS A LOT OF BANGING
COMING FROM INSIDE THE RESD [349 Hillview] –
CALLER IS AFFRAID [sic] TO GO LOOK AGAIN – HAS
HAD PROBLEMS W/JASON BEFORE" at 05:27:53.

*Id.*  Mrs. Kwasniewski's 911 complaint was designated by the 911 call-taker as a Priority 1 call as

a fight in progress.  *See id.* at ¶ 10.  A Priority 1 call was (and still is) the highest emergency

priority in the 911 system and under SPD policy and regulations governing responding to calls for

service by SPD officers.  *See id.*

**B.  Police Arrive at 349 Hillview Avenue**

Defendant was designated as Unit 662A on the date of the incident, and Officer Joseph

Taylor was Unit 632A.  *See* Dkt. No. 71-43 at ¶ 13.  Defendant's patrol responsibilities were

within the territory of the Valley section of Syracuse, and 349 Hillview was in his adjoining

territory.  *See id.* at ¶ 14.  Both Defendant and Officer Taylor were dispatched by 911 at around

5:23 a.m. to 349 Hillview based on Mrs. Kwasniewski's call.  *See id.* at ¶¶ 15, 17.  Prior to his

arrival, Defendant read Mrs. Kwasniewski's notes on his patrol vehicle's MDT for this Priority 1 call. *See id.* at ¶ 16. Defendant and Officer Taylor arrived at the scene at approximately 5:28 a.m. *See id.* at ¶ 18.

Immediately upon arriving, Officer Taylor told Defendant that a handgun was recently recovered from the residence at 349 Hillview. *See id.* at ¶ 21. According to Defendant, Officer Taylor informed him about the handgun "so that we could be obviously on higher alert in case [Plaintiff] decided to go back into the house, just not knowing what potentially was inside the residence." *Id.* at ¶ 22; *see also* Dkt. No. 77 at ¶ 22.

Defendant, Officer Taylor, and all other responding officers during all relevant times were wearing their standard patrol officer uniforms. *See* Dkt. No. 71-43 at ¶ 24. Specifically, Officer Taylor had his badge visible, as well as a large insignia on his chest that said in bold "POLICE." *Id.* at ¶ 25. Defendant was wearing a coat with an SPD patch visible on the shoulder of his left sleeve. *See id.* at ¶ 26.

When Defendant and Officer Taylor approached 349 Hillview at approximately 5:28 a.m., they positioned themselves standing across from Plaintiff, who was on the front porch. *See id.* at ¶ 28. Defendant and Officer Taylor were in the public right of way where the walkway leads from the public sidewalk to the front porch of 349 Hillview, a distance of approximately 20-to-25 feet. *See id.* Once in front of 349 Hillview, Defendant observed blood on the door to the enclosed porch next to the front door to the residence. *See id.* at ¶ 29. Defendant observed Plaintiff "standing on the front porch area, screaming and yelling, kind of demonstratively walking back and forth, and yelling loudly." *Id.* at ¶ 30. Defendant and Officer Taylor then observed Plaintiff walk off the front porch of 349 Hillview while yelling profanities at the

officers, *e.g.*, "what the fuck you doin' here, n****?", "get the F off my property", and "I'll beat your ass." *Id.* at ¶ 31.

From Defendant's perspective, Plaintiff appeared intoxicated and highly agitated.  *See id.* at ¶ 32.  Officer Taylor described Plaintiff's behavior as "highly erratic and causing a disturbance upon arrival." *Id.* at ¶ 33.  Officer Taylor also noted that Plaintiff "appeared intoxicated coming out of his residence yelling at police.  Lopez was yelling and swearing causing a neighbor to call 911.  Lopez continued to swear, threaten and use racial slurs towards police." *Id.* at ¶ 34.  Mrs. Kwasniewski recalled that Plaintiff was "acting nuts on the porch and mouthing off to all of the police officers.  He was yelling and swearing at the officers." *Id.* at ¶ 36. It was also Mrs. Kwasniewski's lay opinion that Plaintiff appeared "to be under the influence of a mind-altering substance." *Id.* at ¶ 37.  The SPD Officers' and Mrs. Kwasniewski's observations about Plaintiff's intoxication were founded, as Plaintiff had admitted that in the hours preceding the incident he (1) was at a bar earlier in the night; (2) began drinking at 12:00 a.m. and had between 5 and 9 bottles of beer and a shot of cognac; (3) had smoked marijuana at 3:50 a.m. for about 15 minutes; (4) had taken Xanax; and (5) had used heroin.  *See id.* at ¶ 38.[2]

When additional officers arrived, they parked their marked SPD patrol vehicles in front of house next door to 349 Hillview.  *See id.* at ¶ 40.  Defendant attempted to engage Plaintiff in conversation to ascertain the nature of the problem at 349 Hillview:

> "I attempted to have a conversation, asking him hey, what's going on?  Who are you telling at?  Are you okay?  Is everybody else okay?  Is there anybody around your that's hurt?  Things like that. But in my opinion it fell on deaf ears.  He was not responsive I would say to my questioning, he just continued his own aggression."

---

[2] Approximately two months prior to the incident, Plaintiff had admitted to medical personnel at the Justice Center that he had a "five bag-a-day heroin habit." Dkt. No. 71-43 at ¶ 39.

*Id.* at ¶ 41.  Plaintiff was "just 'fuck you' and just being belligerent in general." *Id.* at ¶ 42.

Despite SPD's attempts at de-escalation, Plaintiff hurled a recycling bin off of the front porch toward Defendant and Officer Taylor, which was observed by Mrs. Kwasniewski who had an unobstructed view from approximately forty feet away.  *See* Dkt. No. 71-43 at ¶¶ 43-44.  According to Defendant, Plaintiff removed what appeared to be jewelry from his right hand, which Defendant interpreted as an indication that Plaintiff was preparing to fight.  *See id.* at ¶ 45.  Plaintiff continued to scream profanities and racial slurs at Defendant and Officer Taylor.  *See id.* at ¶ 46.

Due to Plaintiff's erratic behavior, Defendant – who had taken lead on the scene for this incident – and Officer Taylor requested an additional officer and radioed for back-up at 5:31 a.m. and continued to stand by.  *See id.* at ¶ 48.  Defendant explained under direct examination at Plaintiff's criminal trial why he radioed for additional units:

> Q.    So did there come a point where you radioed for additional units to respond?
>
> A.    Right.  So right away, within three minutes or so of us getting there and once we realized that he was agitated and that we weren't going to be able to calm him down, right away I asked for more units.  It was minutes later.
>
> Q.    And what was the reason for that?
>
> A.    Just because we don't know exactly if this is going to turn into something worse.  I still have to figure out why I'm there.  It's just not worth us to engage with someone who's acting as irrational.  We don't know if there was drugs in play or if there's weapons available to him or anything else.  So there's safety measures.  A lot of times just having more people show up is enough of a deterrent for somebody to just realize that maybe it's not the best idea for them to keep up their antics, and a lot of times that's enough to get somebody to go back in the house or to calm themselves down, just those pure numbers.

*Id.* at ¶ 49.  It was Defendant's hope that "bringing in the backup would provide a deterrent for Mr. Lopez" and he "would see that there were several of us [police officers] and then decide that he no longer wanted to be aggressive, just go back in the house." *Id.* at ¶ 52.

## C.    Additional Officers Arrive

Defendant continued to use verbal techniques to de-escalate Plaintiff's behavior and to close his investigation into the disturbance reported at 349 Hillview.  *See* Dkt. No. 71-43 at ¶ 53. The recently arrived SPD Officers shared Defendant's, Officer Taylor's, and Mrs. Kwasniewski's observations of Plaintiff, describing him as highly agitated, combative, and angry toward the SPD Officers.  *See id.* at ¶ 54.  Defendant instructed the responding officers to follow his lead, "which was we're just here to make sure that there's no one hurt." *Id.* at ¶ 55.

According to Defendant, "Plaintiff continued to be verbally aggressive, he became increasingly agitated, demonstrated by spitting toward police[.]" *Id.* at ¶ 56.  Defendant continued to try to speak to the residents inside of the household in order to ascertain if anyone inside the house needed police assistance, if anyone was injured, or if a crime had been committed.  *See id.* at ¶ 58.  Defendant ordered the other SPD Officers to stay back behind the sidewalk because of Plaintiff's aggressive behavior.  *See id.* at ¶ 59.

At approximately 5:36 a.m., only two minutes after the additional SPD Officers arrived on scene, 911 alerted the officers of a complaint that someone had jumped out the rear window of the residence at 349 Hillview and ran through the back yard.  *See id.* at ¶ 60.  At this point, Officer Herrington walked down the driveway in an attempt to approach the rear of the residence to check the status of the other occupants and to investigate the complaint.  *See id.* at ¶ 61.  Defendant also instructed Officer Herrington to "look into any windows or if there was anybody in the backyard that was possibly hurt while the rest of us tried to keep Lopez's attention at the front." *Id.* at ¶ 62.

As Officer Herrington began to walk down the driveway, which was to the right of the house, "a very loud ... and angry" Plaintiff threw a white Bic lighter at him from the porch. *See id.* at ¶ 63.

Despite continued assaultive behavior, the SPD Officers "stood by but did not engage as [Defendant] attempted to obtain more information regarding the initial fight complaint" that had come in through 911, as it was his objective to determine that everyone was safe inside the house, that Plaintiff was not a danger to himself or others, and to leave the scene at the conclusion of their shifts at 7:00 a.m. *See id.* at ¶ 64. Defendant still had no intention of arresting Plaintiff for disorderly conduct at this time. *See id.* at ¶ 65.

Defendant "was still trying to speak to the people inside the residence" but was unable to do so "because of how much Lopez was yelling." *Id.* at ¶ 67. At some point, a "young Hispanic male, identified as Luis Davila, emerged from the residence and stated that all parties inside the residence were unharmed." *Id.* at ¶ 68. Defendant still "had no intention whatsoever of engaging Mr. Lopez once [he] had" established that Plaintiff was safe "and that whoever it was he had gotten into this dispute with was also safe." *Id.* at ¶ 69. There were several times that the SPD Officers could have approached Plaintiff, but Defendant "did not want to engage with [Plaintiff]. [He] did not want there [to] be a fight." *Id.* at ¶ 70.

After speaking with Luis Davilla (Plaintiff's nephew), Defendant was now confident the SPD Officers could leave because no one was hurt, harmed, or otherwise needed their assistance inside the house. *See id.* at ¶ 71. As Defendant testified at his deposition: "I was confident enough with that male's answer that we can now leave and there wouldn't be any other issues any longer in that there was no one else fighting with [Plaintiff]." *Id.* at ¶ 72. "Having no reason to believe that an injured party was inside the residence or any crime had been committed beyond disorderly conduct," the SPD Officers began to retreat to their patrol vehicles "so as to not

escalate Lopez's already aggressive behavior." *Id.* at ¶ 73.  Defendant hoped that "police presence being gone would hopefully calm [Plaintiff] down, because he had no one else to direct his aggression toward." *Id.* at ¶ 74.  Defendant had no interest at that point in arresting Plaintiff for disorderly conduct.  *See id.* at ¶ 75.

**D.**     **Plaintiff Attack on SPD Office and Defendant's Intervention**

At this point, all of the SPD Officers on scene began retreating to their patrol cars.  *See* Dkt. No. 71-43 at ¶ 76.  Plaintiff, however, was still irate and continued in his aggressive behavior toward the SPD Officers by approaching them while trying to disperse and leave the scene.  *See id.* at ¶ 77.  Plaintiff continued to yell and scream at the SPD Officers as they were walking toward their vehicles.  *See id.* at ¶ 78.  Officer Taylor, "while walking back to his patrol car advised [Plaintiff] that he had a Coors Light can in his lawn" that should be picked up.  *See id.* at ¶ 79.  At this point, as the SPD Officers were returning to their vehicles, Plaintiff ran down the stairs on the front porch toward the front yard, in a near sprint, and picked up the empty Coors Light can.  *See id.* at ¶ 80.  When Plaintiff was a few feet away from Officer Taylor, he yelled "That's littering," and then threw the empty can at Officer Taylor, striking him in the chest, which caused him to take a step backwards.  *See id.* at ¶¶ 81-83; Dkt. No. 77 at ¶¶ 81-83.

Defendant claims that, after the can bounced off of Officer Taylor's chest, Plaintiff continued to charge toward him, charging to within approximately two feet from Officer Taylor. *See id.* at ¶¶ 84-85.[3]  Officer Taylor testified that he was concerned about his "personal space"

---

[3] As will be discussed in more detail below, although Plaintiff has denied certain aspects of these facts as set forth by Defendant, he has either failed to support these denials with citations to evidence in the record, simply challenges certain assertions with conclusory denials, or provides citations to evidence that does not actually contradict the facts alleged.

because Plaintiff, while, only two feet away, could have grabbed any of the items on his belt, including his baton, department-issued handgun, or pepper spray. *See id.* at ¶ 86.

While this was happening, Defendant was five-to-ten feet away from Officer Taylor and a charging Plaintiff. *See* Dkt. No. 71-43 at ¶ 87. Defendant's perception of the events as they unfolded in that split second was that either Plaintiff was going to pick up the can again or tackle Officer Taylor. *See id.* at ¶ 89. Defendant made the split-second decision to intervene by taking two-to-three steps and lunged, striking Plaintiff in the face with one right closed fist strike to the right side of Plaintiff's face while simultaneously tackling Plaintiff to the ground. *See id.* at ¶ 91.

Mrs. Kwasniewski observed Plaintiff "charge at the officers from on his porch" and "saw what appeared to be a police officer tackle [Plaintiff] as he charged at them." Dkt. No. 71-39 at ¶ 18. Mrs. Kwasniewski stated that he was her opinion "that the police officers had no other choice but to use force on [Plaintiff]." *Id.*

## E.      Plaintiff's Resistance to Handcuffing and Arrest

Plaintiff was tackled by Defendant onto the lawn in the front yard of 349 Hillview, landing on the left side of his body and then face first onto the grass. *See* Dkt. No. 71-43 at ¶ 96. Defendant was immediately on top of Plaintiff and engaged, with Officer Taylor, in a brief struggle to handcuff Plaintiff. *See id.* at ¶ 97.

At his deposition, Plaintiff testified that he lost consciousness and had no recollection of what occurred from the moment he threw the can to the moment he was in handcuffs. *See* Dkt. No. 77 at ¶ 98. Defendant, however, contends that Plaintiff was conscious at this time and refused to give his hands for cuffing. *See* Dkt. No. 71-43 at ¶ 99. Defendant claims that Plaintiff actively refused to give the SPD Officers his hands several times while they attempted to handcuff him as he was face down on the grass. *See id.* at ¶ 100. "Initially, after several refused

attempts to get Plaintiff's hands behind his back, Plaintiff was given several verbal commands by [Defendant] and Officer Taylor to give them his hands for handcuffing," but Plaintiff refused. *See id.* at ¶ 101.  Defendant specifically ordered Plaintiff to place his hands behind his back, but after Defendant had control of Plaintiff's right hand and placed a handcuff on it, Plaintiff again put his right arm underneath his body.  *See id.* at ¶ 102.  When Plaintiff continually refused to place his left hand behind his back, Defendant eventually struck Plaintiff in the left side of his body, causing him to immediately release his left arm and place it behind his back, allowing Defendant to finally effect the arrest.  *See id.* at ¶¶ 103-05.  Defendant described his strike to Plaintiff's body as "a distraction or stunning, called a rabbit punch for layman's terms.  A short burst punch to the back kidney area," which would "have the physiological effect that your body would naturally come back, and therefore put the arms back so that I can get control of that hand and then effect that arrest." *Id.* at ¶ 106.

According to Mrs. Kwasniewski, after Plaintiff "was tackled he was fighting and struggling with the officers until they finally handcuffed him." Dkt. No. 71-39 at ¶ 19.  Mrs. Kwasniewski further states that after he was handcuffed, Plaintiff "settled down significantly." *Id.* at ¶ 20.

## F.   Plaintiff was Conscious and Alert During and After Arrest and Apologetic

The duration of the entire arrest, from the moment Defendant made physical contact with Plaintiff until the arrest was effected by putting Plaintiff in handcuffs, was five-to-ten seconds. *See* Dkt. No. 71-43 at ¶ 108.  After being handcuffed, Plaintiff was apologetic and calm, apologizing in general for his behavior and acknowledged that he "was out of line." *Id.* at ¶¶ 109-10.

Defendant included with his motion a photograph of Plaintiff, taken at the scene of the incident, immediately subsequent to his arrest. *See* Dkt. No. 71-6 at 2. In the photograph, Plaintiff can be seen sitting upright, unassisted, with his hands behind his back. *See id.* Additional photographs taken at the scene of the incident, subsequent to Plaintiff's arrest, show Plaintiff standing unassisted, with his eyes open. *See* Dkt. No. 71-9.

## G.   Resulting Charges

As a result of the incident, Plaintiff was charged with Criminal Mischief in the Fourth Degree, Harassment in the Second Degree, and Disorderly Conduct. *See* Dkt. No. 71-43 at ¶ 133. The Criminal Mischief charge was related to the damage inside of the residence at 349 Hillview caused by Plaintiff. *See id.* at ¶ 134. The Disorderly Conduct charge was related to Plaintiff's behavior inside and outside of the residence that resulted in the 911 call by Mrs. Kwasniewski and Plaintiff's continued creation of a disturbance while officers were on the scene. *See id.* at ¶ 135. The Harassment in the Second Degree charge was for hitting Officer Taylor with the beer can. *See id.* at ¶ 136.

Plaintiff was tried in a bench trial in Syracuse City Court before the Honorable Ross P. Andrews on June 1, 2018, for the charges of Disorderly Conduct and Harassment in the Second Degree. *See id.* at ¶ 155. As a result of the trial, Plaintiff was found guilty of Harassment in the Second Degree. *See id.* at ¶ 156.

## III. DISCUSSION

## A.   Motion to Strike

Defendant has moved to strike certain aspects of Plaintiff's response to the motion for summary judgment. *See* Dkt. No. 80-1. Specifically, Defendant seeks to strike portions of Plaintiff's response to the statement of material facts that are not properly supported by evidence

in the record or that contain improper additional commentary.  *See id.* at 7-23.  Additionally, Defendant seeks to strike the attorney affidavit submitted in response to the motion for summary judgment insofar as it violates Rule 56(c)(4) of the Federal Rules of Civil Procedure, contains improper legal arguments, and improperly attempts to be a statement of material facts.  *See id.* at 23-28.

Under Rule 56, a declaration used to support or oppose a motion for summary judgment must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  "Thus, a court may strike those portions of a declaration that are not made upon the declarant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements." *Federal Trade Commission v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 654 (W.D.N.Y. 2017) (citing *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995)).  Additionally, an attorney affidavit should not be used to introduce legal arguments and generally only appropriately used for the introduction of documents.  *See Smeraldo v. City of Jamestown*, 512 Fed. Appx. 32, 34 (2d Cir. 2013) (noting that the attorney affidavit submitted in opposition to the motion for summary judgment was "more akin to an 'adversarial memorandum than a *bona fide* affidavit,'" which was properly disregarded by the district court) (quotation omitted); *see also Pace v. Air & Liquid Sys. Corp.*, 171 F. Supp. 3d 254, 272 (S.D.N.Y. 2016) (noting that an attorney affidavit is properly used to "place documents produced in discovery before the Court") (citation omitted).  "'Because a decision on the motion to strike may affect [the movant's] ability to prevail on summary judgment, it is appropriate to consider a motion to strike prior to a motion for summary judgment.'" *Id.* (quoting *Pugliese v. Verizon N.Y., Inc.*, No. 05-CV-4005, 2008 WL 2882092 (S.D.N.Y. July 10, 2008)).

In the present matter, the Court finds that the vast majority of the Castle Affidavit improperly asserts facts that are not based on Mr. Castle's personal knowledge or are improper legal arguments. The Castle Affidavit goes beyond the introduction of documents and veers into legal argument and factual allegations for which Mr. Castle has not personal knowledge. Using its discretion, the Court will not strike the Castle Affidavit from the record and the motion to strike is therefore denied. However, the legal arguments and factual allegations contained within the Castle Affidavit will not be considered. Instead, this Court considers only those sections that introduce the attached exhibits. *See Vantage Point Servs., LLC*, 266 F. Supp. 3d at 654 (citations omitted).

Similarly, to the extent that Defendant seeks to strike portions of Plaintiff's response to the statement of material facts that are not properly supported by evidence in the record, the motion is also denied. Rather, the Court will only consider the denials in Plaintiff's response to the statement of material facts that are properly supported by citations to relevant evidence in the record. *See Claude v. Wells Fargo Bank, N.A.*, No. 3:13-cv-535, 2015 WL 5797007, *2 (D. Conn. Sept. 30, 2015) (holding that "[m]otions to strike directed at summary judgment briefings 'are unnecessary and produce only redundant statements by the court that it has not relied on such inadmissible evidence in deciding the summary judgment motion'") (quotation omitted). This result is specifically supported by Local Rule 56.1(b), which provides that the response to the moving party's statement of material facts shall "mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs." N.D.N.Y. L.R. 56.1(b). The Rule continues by providing that "[e]ach denial shall set forth a specific citation to the record where the factual issue arises. The Court may deem admitted any properly supported facts set forth in the Statement of Material

Facts that the opposing party does not specifically controvert." *Id.* (emphasis in original).  Based on this Rule, the proper sanction is not to strike Plaintiff's response, but to deem admitted those portions of Defendant's statement of material facts that are not properly opposed.  *See Wanamaker v. Town of Westport Bd. of Educ.*, No. 3:11-cv-1791, 2013 WL 3816592, *2 (D. Conn. July 22, 2013) (citation omitted).

Accordingly, the Court denies Defendant's motion to strike.

**B.** **Summary Judgment Standard**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986).  In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson*, 477 U.S. at 255) (other citations omitted).  Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute.  *See Anderson*, 477 U.S. at 258.

The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving

party's case.  *See id.* at 325.  Once the movant meets this initial burden, the nonmoving party must

demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).  A

genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## C.      **Excessive Force**

In the present matter, Plaintiff alleges that Defendant used excessive force when (1) he

struck and tackled Plaintiff in one continuous movement as he was approaching Officer Taylor

and (2) when Defendant struck Plaintiff on the left side of his body when he was non-compliant

when Defendant was attempting to place him in handcuffs.  *See* Dkt. No. 1 at ¶ 12.  As set forth

below, the undisputed facts establish that Defendant is entitled to summary judgment.

"Excessive force claims related to an arrest or seizure are evaluated under the Fourth

Amendment using an 'objective unreasonableness' standard." *Bogart v. City of New York*, No.

13-CV-1017, 2016 WL 4939075, *7 (S.D.N.Y. Sept. 6, 2016) (quoting *Graham v. Connor*, 490

U.S. 386, 388 (1989)).  Because the force used in the present matter occurred during Plaintiff's

arrest, his claims are properly analyzed under the reasonableness standard set forth in *Graham*.

*See Francis v. Vill. of Potsdam*, No. 8:20-cv-1097, 2023 WL 2655677, *3 (N.D.N.Y. Mar. 27,

2023).

"The Fourth Amendment prohibits the use of excessive force in making an arrest, and

whether the force used is excessive is to be analyzed under that Amendment's 'reasonableness

standard.'" *Outlaw v. City of Hartford*, 884 F.3d 351, 366 (2d Cir. 2018) (quoting *Brown v. City of

New York*, 798 F.3d 94, 100 (2d Cir. 2015)).

The reasonableness determination must include consideration of the fact that law

enforcement officers often are forced to make quick decisions under stressful and rapidly

evolving circumstances rendering the calculation of what amount of force is reasonable difficult. *See Graham*, 490 U.S. at 396-97.  Relevant factors include the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether the suspect was actively resisting arrest.  *See Brown*, 798 F.3d at 100 (citing *Graham*, 490 U.S. at 396).  As to the third factor, "[t]he fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of *some* degree of force, but it does not give the officer license to use force without limit.  The force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." *Sullivan v. Gagnier*, 225 F.3d 161, 165-66 (2d Cir. 2000) (emphasis in original).  Further, "'reasonable force does not become unconstitutional merely because it caused the plaintiff serious injury.'" *Otero v. Town of Southampton*, 194 F. Supp. 2d 167, 180 (E.D.N.Y. 2002) (quoting *Gonzalez v. City of New York*, No. 98-CV-3084, 2000 WL 516682, *4 (E.D.N.Y. Mar. 7, 2000)), *aff'd*, 59 Fed. Appx. 409 (2d Cir. 2003).  Moreover, to support an excessive force claim, the plaintiff must establish that the defendant used more than *de minimis* force.  *See Feliciano v. Thomann*, 747 Fed. Appx. 885, 887 (2d Cir. 2019).  Even conduct that caused some physical pain and resulted in side effects need not be compensated if a jury finds that such injuries were *de minimis*.  *See Kerman v. City of New York*, 374 F.3d 93, 123 (2d Cir. 2004).

As to the first factor under *Graham*, it is true that Plaintiff was not charged with or convicted of a serious crime.  Harassment in the Second Degree is considered a violation under New York Penal Law § 240.26.  Despite the severity (or lack thereof) of the crime, the totality of the circumstances establish that Defendant's actions were reasonable under the circumstances.  Notably, Plaintiff was intoxicated and high at the time of the incident, and admits that in the hours

leading up to the incident, he had consumed between 5 and 9 bottles of beer, a shot of cognac, had

smoked marijuana at 3:50 a.m., had taken a Xanax, and had used heroin.  *See* Dkt. No. 71-43 at ¶

38; Dkt. No. 77 at ¶ 38.

Defendant's intention in dealing with the dispatched call at 349 Hillview was to focus on

the safety of all persons that may be inside of the residence due to the nature of the call ("fight in

progress"), the knowledge of a gun having been in the house, the presence of what appeared to be

a blood smear on a door by the entrance, the erratic and assaultive behavior of the suspect

(Plaintiff), and his apparent intoxication amplifying concerns about unpredictable and irrational

behavior.  *See* Dkt. No. 71-43 at ¶¶ 9-10, 21-23, 29, 32-34, 38, 48, 127, 131.  While Defendant

was *en route* he was provided with the details of the dangerous observations by Mrs.

Kwasniewski.  *See id.* at ¶¶ 10, 16.

Additionally, Plaintiff at all times also exhibited conduct consistent with pre-assaultive

behavior, which concerned Defendant.  *See* Dkt. No. 71-38 at ¶ 15.  This included, among other

things, Plaintiff's yelling and screaming, use of profane language and racial slurs, his threats to

fight the officers, throwing objects at police officers, and other pre-assault indicators like taking

off jewelry.  *See* Dkt. No. 71-43 at ¶¶ 30-31, 34-36, 44-45, 63, 78, 80-81, 157; *see also* Dkt. No.

75-21 at 11, 14, 45.  Defendant went to great lengths to avoid arresting and engaging in an

altercation with Plaintiff by verbally de-escalating Plaintiff's behavior, requesting back-up as a

show of force, and trying to all-but ignore Plaintiff's disorderly behavior (including the throwing

of multiple objects directly at police officers) until Plaintiff threw an empty beer can at Officer

Taylor, striking him in the chest, and then continue to charge toward Officer Taylor, charging to

within approximately two feet from him.  *See* Dkt. No. 71-43 at ¶¶ 81-86.  Upon seeing Plaintiff

moving towards Officer Taylor, Defendant made the split-second decision to intervene by lunging

at Plaintiff, while striking him with a closed-fist and tackling him to the ground in the same movement.  *See id.* at ¶¶ 90-94.

In response to Defendant's motion, Plaintiff uses speculative language, characterizing the "instant record demonstrates that the Defendant's allegations as to what occurred immediately after Plaintiff threw the beer can are questionable and highly suspect." Dkt. No. 75 at 8.  In his response to Defendant's allegations that he "observed Plaintiff charging at Officer Taylor," Plaintiff responds as follows:

> Denies.  The contemporaneous Police Incident Report of Officer Gerace, the contemporaneous Police Incident Reports of Officer Taylor, and the contemporaneous Use of Force Report prepared by Sergeant Malinowski following a use of force investigation do not specify that Officer Gerace observed the Plaintiff charging at Officer Taylor.  (Exhibit "C"; Exhibit "D"; Exhibit "E"; Exhibit "F").  The portion of the record cited by the Defendant is inconsistent with and contrary to the contemporaneous Police Reports.

Dkt. No. 77 at ¶ 88.  Plaintiff seeks to create a question of fact by alleging that because the police reports were either inconsistent with subsequent testimony or had certain omissions that were later clarified, the facts alleged are manufactured.  Plaintiff, however, cannot "rely on mere speculation or conjecture as to the true nature of the facts." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).  Notably missing from Plaintiff's response to Defendant's statement of material facts is actual evidence in support of his bald speculation.

Notably, in his deposition and in his response to the statement of material facts, Plaintiff alleges "that he had lost consciousness and had no recollection of what occurred from the moment he threw the can to the moment he was in handcuffs." Dkt. No. 77 at ¶¶ 97-104; *see also* Dkt. No. 75-19 at 94-95.  Since Plaintiff claims to have no recollection as to what occurred after he threw the can, he cannot create a question of fact through mere speculation.  *See Commander v.*

*American Cruise Lines, Inc.*, 389 F. Supp. 3d 180, 187 (N.D.N.Y. 2019) (holding that the plaintiff's inability to recall a properly supported fact in the defendant's statement of material facts was a "non-denial" that is insufficient to create a genuine dispute of material fact) (citing cases); *Brown v. St. Paul Travelers Cos., Inc.*, 331 Fed. Appx. 68, 70 (2d Cir. 2009) (finding the plaintiff's statement that she has "no recollection or record of receiving" the relevant document, despite the fact that it was distributed on at least six occasions during her tenure, insufficient to raise a genuine issue of material fact); *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses ... do not create genuine issues of material fact"); *Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1056 (7th Cir. 2011) (holding that an alleged lack of recollection was "inconclusive," and "cannot by itself create a genuine factual dispute") (citations omitted); *Larsen v. Carroll Cnty.*, 798 Fed. Appx. 942, 944 (7th Cir. 2020) (holding that the plaintiff's "lack of recollection" regarding whether she gave consent for the defendants to search her home "does not, by itself, create a genuine dispute of material fact") (citation omitted).  Defendant, however, has cited the deposition testimony of the officers on scene, as well as the affidavit of Mrs. Kwasniewski, who all stated that Plaintiff was charging at Officer Taylor, which is what prompted the use of force.  *See, e.g.*, Dkt. No. 71-39 at ¶ 18 ("After the police officers were at 349 Hillview Avenue for a while, I saw Jason charge at the officers from on his porch.  It is my opinion, based on everything I saw, that the police officers had no other choice but to use force on Jason.  I saw what appeared to be a police officer tackle Jason as he charged at them").  Plaintiff, with no recollection, fails to refute this properly supported fact.

In his response, Plaintiff makes no attempt to distinguish the cases relied upon by Defendant and, instead, relies on *Echols v. Knoth*, No. 1:20-cv-519, 2022 WL 2463035 (N.D.N.Y. July 6, 2022), where the only similarity is that the plaintiff in that case had a broken jaw.  In

*Echols*, the court denied the defendant's motion for summary judgment where there was no dispute that the defendant officer struck the plaintiff at least three-to-four times in rapid succession when the plaintiff was already handcuffed and in the officer's patrol vehicle. *See id.* at *2. Moreover, the issues of fact based on the record before the court included whether "(1) Defendant's arm was trapped under Plaintiff in the back of the vehicle or Defendant jumped on Plaintiff after Plaintiff insulted him; (2) Plaintiff spit in Defendant's face before or after Defendant struck him; and (3) Plaintiff's injuries were caused by" an individual who had punched the plaintiff in the face earlier in the night or by the defendant once in the patrol vehicle. *See id.* at *5. The Court finds that this case is clearly distinguishable from the present matter, not only based on the facts, but also because the plaintiff's response to the motion for summary judgment actually created questions of fact supported by the evidence in the record.

Recently, in *Lilley v. Matthews*, No. 22-cv-8, 2023 WL 3250495 (W.D. Wis. May 4, 2023), the court ruled in the defendant officer's favor with facts similar to those in the present matter. In *Lilley*, the defendant officer was dispatched to a domestic disturbance call at the plaintiff's residence with another woman. *See id.* at *2. The defendant responded with two other officers. *See id.* The defendant, who was first on the scene, and was familiar with the residence and with the plaintiff from previous calls, entered the residence with his gun drawn, announced that he was with the Sheriff's Department, and began search for the plaintiff and the plaintiff's roommate. *See id.* The defendant found the roommate in a bedroom, who told the defendant that the plaintiff was in another bedroom across the hall and that he did not have a gun. *See id.* The defendant opened the plaintiff's bedroom door, turned on the lights, holstered his weapon, and announced that he was with the Sheriff's Department. *See id.* By then, a fellow officer, Lieutenant Dorshorst, had arrived an entered the bedroom behind the defendant where the

21

plaintiff was lying naked in bed with a blanket over him.  The plaintiff responded to the officers' intrusion with surprise and anger, shouting "What the fuck?!"  The defendant asked the plaintiff to stand up, turn around, and put his hands behind his back, stating that he wanted to talk to the plaintiff.  *See id.*  The plaintiff, who continued to lie on his bed, said, "No.  You just get out of my house right now."  It was obvious to both the defendant and his fellow officer that the plaintiff was intoxicated.  *See id.*

At a certain point, the defendant asked the plaintiff to put some clothes on and get out of bed to talk to him.  *See id.*  A verbal back and forth ensued where the defendant would use a calm voice and the plaintiff responded, angrily at times, and refused to comply.  *See id.*  Eventually, Lt. Dorshorst told the plaintiff that he was going to get the plaintiff a pair of shorts from a pile of clothes in the bedroom.  *See id.*  The officers were told by dispatch that, among other things, the plaintiff had a no-contact order and was not permitted to be in the residence.  *See id.*  The officers determined that he was going to be taken to jail at that point.  *See id.*  The defendant went back to the side of the bed closest to where the plaintiff was lying.  *See id.*  The defendant told the plaintiff that he was not supposed to be there, to which the plaintiff angrily responded while Lt. Dorshorst held out a pair of shorts towards the plaintiff, telling the plaintiff that he needed to put them on.  *See id.*  The plaintiff partially sat up and refused:

> Lilley suddenly and quickly sat up, whipped the blanket aside, said "fuck you," and moved quickly towards Dorshorst.  (The parties offer different characterizations of Lilley's movements: Defendants say Lilley "lunged" towards Dorshorst; Lilley says he merely "reached for" the shorts from Dorshorst to put them on. ...)
>
> In response to Lilley's sudden movement, [the defendant] dove across the bed and grabbed Lilley around the head and shoulders in an attempt to restrain him.  [The defendant] testified that he tackled Lilley because, based on Lilley's refusal to cooperate, intoxicated state, and belligerent behavior up to that point, along with his sudden action of bolting upright and moving towards Dorshorst,

> [the defendant] considered Lilley an immediate physical threat to
> Dorshorst.

*Id.*  After being talked, the officers used seven knee strikes to get the plaintiff to cooperate with

handcuffing, which he was actively resisting.  *See id.* at *2-3.  Considering the facts, the court

ruled that from the defendant's vantage point, he was dealing with an intoxicated and belligerent

individual who was refusing commands from officers, the defendant "was not required to wait

until Lilley actually attached Dorshorst or grabbed a weapon he might have had hidden nearby

before taking action to ensure Dorshorst's safety." *Id.* at *5 (citing *Henning v. O'Leary*, 477 F.3d

492, 496 (7th Cir. 2007)).  Further, the court found that, regardless of the fact that the plaintiff's

underlying offense – violating his conditions of release – was not particularly severe, the

defendant had the right under *Graham* to use force to protect his fellow officer and to effectuate

an arrest.  *See id.*

In the present matter, as in *Lilley*, the Court finds that, considering the totality of the

circumstances, including the fact that Plaintiff was belligerent, intoxicated, disobeying directives,

and eventually charging at Officer Taylor, Defendant's use of force was not excessive in violation

of the Fourth Amendment.  Given these facts, as well as the fact that Defendant was faced with a

split-second decision to respond to Plaintiff's actions, Defendant's actions were objectively

reasonable.  *See Solomon v. City of Rochester*, 499 F. Supp. 3d 104, 112 (W.D.N.Y. 2020)

(granting the defendants' motion for summary judgment on excessive force claim where, after the

plaintiff was tasered and while he continued to resist arrest, a defendant punched the plaintiff a

single time on the side of the plaintiff's face, resulting in the plaintiff being subdued); *Rivera v.*

*City of Yonkers*, 470 F. Supp. 2d 402, 407 (S.D.N.Y. 2007) (granting summary judgment on

excessive force claim where the plaintiff fled and resisted arrest, one officer "responded with a

single punch to Plaintiff's jaw," and two officers "engaged in a physical struggle with Plaintiff in

an effort to subdue him"); *Davis v. Callaway*, No. 3:05-cv-127, 2007 WL 1079988, *4-5 (D.

Conn. Apr. 9, 2007) (holding that the defendant's use of force was reasonable where the plaintiff

initially obeyed an order to sit on the ground, but then jumped up to protest the treatment of

another arrestee, and the defendant tackled the plaintiff to the ground for the protection of other

officers on the scene of a traffic accident and altercation, and the defendant forcefully placed his

knee on the plaintiff's back to restrain him); *Tracy v. Freshwater*, 623 F.3d 90, 97 (2d Cir.2010)

(holding that where the defendant "made a quick and sudden movement as [the officer] attempted

to effect an arrest without the assistance of other officers ... [h]is decision to use his flashlight to

protect himself and subdue an arrestee he perceived to be actively resisting was ... a reasonable

response").  Similarly, the force used to effect the arrest once Plaintiff was tackled to the ground

was reasonable in light of the fact that he continued to resist and refused to permit Defendant and

the other officers to place him in handcuffs.  *See Tracy*, 623 F.3d at 97; *see also Husbands v. City

of New York*, 335 Fed. Appx. 124, 129 (2d Cir. 2009) (holding that the officer's punch to

arrestee's torso was not excessive force because it "was necessary to subdue [the arrestee] and

apply handcuffs").  Moreover, no additional force was used once the officers were able to place

Plaintiff in the handcuffs.

Accordingly, the Court grants Defendant's motion for summary judgment.

**D.    Qualified Immunity**

"Section 1983 establishes a private right of action for money damages against state

officials, acting 'under color' of law, who violate a constitutional or statutory right." *Edrei v.

Maguire*, 892 F.3d 525, 532 (2d Cir. 2018) (quoting 42 U.S.C. § 1983).  "This 'deter[s]

governmental abuse and remed[ies] unlawful governmental transgressions.'" *Id.* (quotation

omitted).  "At the same time, 'permitting damages suits against government officials can entail

substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).  "To balance the need for accountability and the potential chilling effect, 'the Supreme Court established qualified immunity as an affirmative defense to § 1983 claims.'" *Id.* (quotation omitted).  "This defense is designed to 'reduce[ ] the general costs of subjecting officials to the risks of trial' by immunizing them from monetary liability 'based on unsettled rights.'" *Id.* (quoting *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998)).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A court may determine whether a defendant is entitled to qualified immunity without determining whether there was a deprivation of a constitutional right.  *See id.* at 236.  "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  "[I]f officers of reasonable competence could disagree on [whether the conduct is constitutional], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

As "'existing precedent must have placed the statutory or constitutional question beyond debate[,]' ... '[qualified] immunity protects all but the plainly incompetent or those who knowingly violate the law.'" *Kisela v. Hughes*, ___U.S. ___, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).  Thus, an officer is entitled to qualified immunity unless "existing precedent 'squarely governs' the specific facts at issue." *Id.* at 1153 (citing *Mullenix v. Luna*, 577 U.S. 7, 13 (2015)).  As the Supreme Court has emphasized, clearly established law should not be

defined at a high level of generality. *See id.* at 1152. Rather, "the general rules set forth in *Garner* and *Graham* do not by themselves create clearly established law outside an 'obvious case.'" *Id.* at 1153 (quoting *White*, 580 U.S. at 80). "Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *Id.*

In the alternative, the Court finds that Defendant is entitled to qualified immunity because officers of reasonable competence could disagree on the legality of the action at issue in this particular context. Specifically, Defendant was confronted with a belligerent, non-compliant, intoxicated individual who was repeatedly yelling obscenities at the responding officers and throwing items at them. When Plaintiff began charging at Officer Taylor, Defendant was faced with a split-second decision regarding whether he should intervene and what would be required to effectively protect his fellow officer. Based on the undisputed evidence, even if his conduct was excessive, Defendant is entitled to qualified immunity. *See Francis*, 2023 WL 2655977, at *5.

Accordingly, the Court grants Defendant's motion on this alternative ground.

**E.    Fourteenth Amendment Claim**

In his complaint, Plaintiff alleges that Defendant violated his rights under the Fourteenth Amendment. In his motion for summary judgment, Defendant argued that this claim must be dismissed because the alleged excessive force occurred during the course of an arrest and, therefore, the claim is governed by the Fourth Amendment. *See* Dkt. No. 71-44 at 27-28. Plaintiff did not response to this aspect of Defendant's motion.

As Defendant correctly argues, Plaintiff's excessive force claim is governed by the Fourth Amendment and, therefore, his claim under the Fourteenth Amendment must be dismissed. *See*

*Durr v. Slator*, 558 F. Supp. 3d 1, 15 (N.D.N.Y. 2021) (citing cases).  Accordingly, the Court

grants Defendant's motion for summary judgment as to this claim.  Alternatively, the Court finds

that this claim is subject to dismissal because Plaintiff failed to oppose this aspect of Defendant's

motion for summary judgment and, therefore, has abandoned this claim.  *See Feacher v.*

*Intercontinental Hotels Grp.*, 563 F. Supp. 2d 389, 480 (N.D.N.Y. 2008).

Accordingly, the Court grants this aspect of Defendant's motion for summary judgment.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the

applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 71) is **GRANTED in**

**its entirety**; and the Court further

**ORDERS** that Defendant's motion to strike (Dkt. No. 80) is **DENIED**; and the Court

further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close

this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: November 3, 2023
        Albany, New York

Mae A. D'Agostino
U.S. District Judge